OPINION OF THE COURT
GAMBOA Judge:
Appellant was convicted, contrary to his pleas, by general court-martial, of murdering Yolanda Pengson, and then desecrating her corpse. Articles 118 and 134, UCMJ, 10 U.S.C. §§ 918 and 934 (1988). His approved sentence is a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to the grade of E-l. Appellant assigns five errors. One assigned error challenges the admissibility of certain Deoxyribonucleic Acid (DNA) testing evidence, because the methodology and the locus where the test focused were unreliable. Admissibility of this DNA evidence is an issue of first impression for this Court.
I. FACTS
Appellant was stationed at Rhein-Main Air Base (AB), Germany. Although he was married, his wife and child did not accompany him, and he was living in an apartment at the time of the alleged offenses. According to appellant’s former roommate, Staff Sergeant Simmons Ennis, appellant would look through the personal advertisements of local papers for Filipino women who were in search of male companionship, because he considered them a “sub-race” subservient to Americans. As a result of one of these ads, he met Tessie Blumenstein, who introduced him to Ms. Yolanda (Yoli) Pengson. After a brief affair with Ms. Blumenstein, appellant began seeing Ms. Pengson. Ms. Pengson told another friend, Teresita Justice, that she was in love with appellant and wanted to marry him. During March 1991, appellant tried to end the relationship with Ms. Pengson on many occasions, but Ms. Pengson would not allow the relationship to end, and she would phone appellant several times a day. Appellant told his roommate that he was going to go to the embassy to try to get Ms. Pengson’s “green card” revoked, and that he would have to do “something else” if that didn’t work. In August 1991, appellant went on leave to the United States to visit his family. When he returned, appellant asserted his former roommate told his wife that he was “fooling around” in Germany, and, as a result, appellant was afraid his wife was going to divorce him. Appellant asked the noncommissioned officer in charge (NCOIC) of Combat Arms and Training how to build a silencer. When asked why he needed to know, appellant said “he had a problem to take care of.”
On Thursday, 5 September 1991, appellant reserved a maroon Ford Sierra from the Hertz Auto Rental on Rhein-Main AB. David Adams, a former security policeman who worked part-time for Hertz while a member of the Air Force, testified that he inspected the rental car when he picked it up at Kelsterbach for transport to Rhein-Main and also cleaned the vehicle before it was rented to appellant. On the afternoon of 5 September 1991, appellant purchased coupons for 100 liters of gasoline. Appellant picked up the rental car on Friday, 6 September 1991, at about 1600, accompanied by a woman named Yolanda who had the same physical characteristics (short, dark haired) as the victim. The odometer reflected 16,572 kilometers. Later that day, Senior Airman Gilbert Patterson saw appellant driving the rental car. Appellant told Airman Patterson he rented the car to take a trip to Hannover. *627 Appellant told a co-worker/supervisor, Master Sergeant Marvin Evans, that his auto was running poorly, and that he rented a car to take a trip to north Germany with a friend who was returning from the United States. The round trip to Hannover is about 700 km. When Ms. Pengson left work on Friday, she told her employer' that she was going to spend the weekend with the appellant.
On Saturday, 7 September, Sergeant Evans saw appellant drive past the Base Exchange at Rhein-Main AB. That evening, Ms. Pengson attended a party at the home of Ms. Justice. While at the party, Ms. Pengson phoned appellant and said she would meet him that evening at Hauptbahnhof. She also told Ms. Justice she was going to meet the appellant. After the party, Ms. Justice walked Ms. Pengson to the train station at Schiesshuttenstrasse, where the streetcar operator saw Ms. Pengson board the train. No one saw Ms. Pengson alive after that evening. Ms. Justice was scheduled to work with Ms. Pengson on Sunday, 8 September. However, Ms. Pengson never arrived.
In addition to his military duties, appellant worked part time at the base Auto Skills Center. On Saturday, 7 September, he worked his normal day shift. That afternoon he loaned his vehicle to Airman Patterson, whose car had broken down. That night at approximately 2200-2230, a female with “an oriental voice” phoned the Auto Skills Center and asked to speak to the appellant. Appellant, who had been there earlier that evening and left, returned about 30 minutes later. When told about the phone call, he said “ok” and left about five minutes later.
Later Saturday night or early Sunday morning, appellant phoned his Auto Skills Center supervisor and advised him that he would be late for the 0800 shift. Appellant did not arrive at the Auto Skills Center until 1030, and worked until about 1830. He phoned Sergeant Evans on Sunday evening between 2300 and 2400 hours, and asked to be excused from work on Monday, claiming he had to work at the Auto Skills Center that (Sunday) night.
Around 0300-0400 on Monday, 9 September, appellant drove the rental car to the 435th Transportation Squadron compound. The compound is immediately adjacent to Building 243, appellant’s duty section, and vehicles must enter the compound to get to Building 243. When asked by a driver why he was in the compound, appellant responded that he had to work on his vehicle, had authority to do so and had his tools in the trunk. Appellant then drove the rental car into the Building 243 garage and departed in the rental car about 45 minutes later.
On Monday morning, 9 September, at about 0710, Manfred Bub was riding his bicycle through the forest near Kronau, which is located about 100 km from Frankfurt, when he saw a dark colored car coming from the forest traveling at a high rate of speed. After the vehicle went by, Herr Bub looked in the direction from which the vehicle had come and saw “something like light shining from out of the forest____” At approximately 0815 on 9 September, a forester came upon what appeared to be a human body that was burning and notified the police.
Appellant visited his duty section for a brief period on Monday morning shortly after 0900, and received his car keys (and car) from Gilbert Patterson around that time. Around 0950 that same morning, appellant returned the rental car to the Hertz Rental Car agent on Rhein-Main. Appellant told the agent that there were leaves and dirt in the back floorboard and the trunk when he rented the vehicle. When David Adams inspected the car on its return, there was dirt and mud in the back seat and a large stain in the trunk. The stain was approximately one foot in diameter and dry and crusty to the touch. The vehicle’s odometer registered 17,126 kilometers when returned by appellant. While rented to appellant, the car was driven a total of 554 kilometers. On 10 September, the car was cleaned.

Investigation

An autopsy found that the body discovered in the forest was badly burned. The head and hands had been removed, probably by repeated cuts with a knife, and an ax or machete had been used to sever the spine and bones in the arms. There were also *628 parallel grooves on one of the victim’s forearms consistent with the use of a saw. Based on food found in the digestive track, which mirrored that eaten by Ms. Pengson at Ms. Justice’s party, the pathologist determined that the victim had eaten within four or five hours of her death. He determined the victim was dead at the time the body was set afire, and opined that the cause of death was massive loss of blood. He also estimated that death occurred between one and three days before the body was discovered. The victim’s head and hands were never recovered.
On 9 September 1991, German police officers removed blood, tissue and hair samples from the body and obtained blood samples from Ms. Pengson’s two sisters. On 20 September 1991, they seized undergarments and collected hairs from Ms. Pengson’s apartment. On 2 October 1991, German police officers took hair samples from the women’s restroom wash basin drain, in Building 243, and seized an ax from a shelf in the hallway of Building 243, because it was the only ax there that was unwrapped and without dust. A small stain on the ax field tested positive for the presence of blood. The automobile appellant rented from 6-9 September, had since been rented to two laborers. On 25 September 1991, police seized the vehicle and took fiber samples.
A biologist, specializing in hair analysis for the State Bureau of Criminal Investigation at Stuttgart, testified that the hairs that were taken from the bra found on the burned body in the forest matched those from Ms. Pengson’s apartment. The hair from Ms. Pengson’s apartment exhibited an unusual phenomenon that neither the biologist nor her colleague had seen before, i.e. sharp bends like a curve. She found this phenomena in hair from the burnt torso, the bra, and the wash basin drain of Building 243.
Dr. Werner Pflug, a serologist and microbiologist at the State Bureau of Criminal Investigation at Stuttgart, conducted DNA analysis of blood and tissue samples from the body discovered in the forest, samples from the undergarments taken from Ms. Pengson’s apartment, blood samples from the ax seized from Building 243, blood samples from Ms. Pengson’s sisters, and minute suspected blood samples which were lifted from the rental vehicle following its cleaning.
Dr. Pflug performed DNA testing on the undergarments, tissue from the victim and blood samples from Ms. Pengson’s sisters using the Restricted Fragment Length Polymorphism (RFLP) methodology, and concluded that the DNA results from these items were consistent with the DNA fragments from the body discovered in the forest and the undergarment’s from Ms. Pengson’s apartment. He also determined that the blood samples from Ms. Pengson’s sisters had DNA fragments in common with the tissue from the victim. Dr. Pflug then performed DNA testing of the samples from the body found in the forest and the undergarments found in Pengson’s apartment using the Polymerase Chain Reaction (PCR) method, using specifically the Amplified fragment length polymorphism (Amp-FLP) subset in the Apo-Lipo protein, B gene (Apo-B) locus. He determined that the DNA from all these sources was identical.
Dr. Pflug conducted DNA testing on the material taken from the trunk and driver’s seat of the rental car and the ax seized from Building 243 using only the PCR methodology because RFLP testing was not possible on samples that small. Based on his analysis, Dr. Pflug concluded that the samples taken from the victim, from the driver’s seat and trunk of appellant’s rental car, and from the ax all contained similar DNA fragments.
II. ADMISSIBILITY OF PCR DNA TESTING EVIDENCE
Appellant argues that the military judge erred in admitting DNA testing evidence of the samples from the rental car and the ax because: PCR Amp-FLP technology is still under development and scientific standards and guidelines have not been established; the Amp-FLP testing in the Apo-B region methodology, used by Dr. Pflug, has been considered for use and rejected by the Federal Bureau of Investigation (FBI) and Royal Canadian Mounted Police as unreliable; and Dr. Pflug’s methodology was flawed. While appellant concedes that the PCR methodology has been subjected to peer review and *629 publication and is generally accepted, he asserts that PCR is a broad term encompassing three different types of testing — DQ-Alpha, Amp-FLP, and Mitochondrial DNA Sequencing. Appellant, supported by both government and defense expert testimony, states that only DQ-Alpha has been admitted in any American court. He contends that the PCR Amp-FLP testing in the Apo-B region employed by Dr. Pflug is not scientifically reliable. This is the first time this Court, or to our knowledge any military court, has addressed the admissibility of DNA testing using the PCR method or the Amp-FLP subset in the Apo-B locus.

Background-DNA Testing

There are two types of DNA testing, RFLP and PCR. The FBI has used RFLP testing for five years. Admissibility of the RFLP based evidence was not contested. Both methods look at the variable number of tandem repeats (VNTRs), and these repeats can vary in terms of the size of each repeat. One allele (fragment) is distinguished from another one by its overall length, which has variability among the population. Essentially, one looks at whether or not DNA bands match. Then the question is, if a number of these bands match, what is the probability that another individual would randomly have the same pattern.
PCR methodology has been used for eight years, and is widely accepted in the medical and scientific community, as well as the clinical diagnostic field. PCR is used in lieu of RFLP when the amount of available DNA to examine is too small. PCR generates a DNA profile in much the same way as RFLP, except that, instead of cutting out the DNA to be tested, the region of interest is amplified prior to testing.
The subset of PCR, Amp-FLP, used in the analysis in issue here, has been used in research for 5 or 6 years. No American criminal laboratory currently uses Amp-FLP DNA testing. Amp-FLPs were used to reassociate the fragmented remains of DESERT STORM casualties. The Apo-Lipo protein, B gene (Apo-B), located on Chromosome # 2, helps transport cholesterol through the blood. It is a particular location on the DNA which is highly variable and informative, and therefore attractive for DNA testing. The Analytical Genetic Testing Center in Denver, a private, for profit laboratory involved in paternity and forensic testing, uses Apo-B as the Amp-FLP identification area in their analyses. It was the location used by Dr. Pflug in his PCR Amp-FLP testing.

Testimony

Dr. Pflug testified that he used PCR in the Apo-B locus for investigating the micro blood stains found on the ax and on the fibers from the rental vehicle because the samples collected were too small to use the RFLP method. He has studied the Apo-B area for almost two years and has analyzed about 4,000 PCR case samples during this time. He has examined about 120 cases containing 3,000 to 3,500 samples using ApoB. He uses a protocol and standard operating procedure for running PCR tests in his laboratory. Dr. Pflug’s laboratory quality control and proficiency, including his PCR procedures, are tested twice a year by a German organization which inspects 30 to 40 laboratories in the German speaking nations of Germany, Switzerland, and Austria.
Dr. Pflug testified that in PCR there are distinct fragments and these distinct fragments are compared to the known fragments of his ladder. His allele ladder is made up of known human DNA samples. He asserts that this serves as the necessary human DNA control. Dr. Pflug stated his ladders fulfill the purpose of a positive control, and that, as a result, he can correctly determine the genotype.
Using PCR, Dr. Pflug found that the samples taken from Ms. Pengson’s underpants and the samples from the victim’s torso matched. He concluded that the genotype from the undergarments and the torso matched those samples taken from the ax and from the rental car. There was only enough material from the ax and the car to perform the test one time.
Dr. Valerie Prenger, a human population genetics expert, testified that she examined a Filipino database of DNA tests results that *630 had been generated by Dr. Pflug. Based on her analysis, she concluded that, conservatively, it was 76.5 times more likely that the samples tested by Dr. Pflug, using PCR, came from the victim than someone else in the Filipino population. Dr. Prenger also concluded that it was 843.2 times more likely that the DNA fragments found by Dr. Pflug in the samples from the rental car and the ax, which he tested using PCR, came from the victim than from anyone else in the general population.
Dr. Arthur Eisenberg, Associate Professor of Pathology at the Texas College of Osteopathic Medicine, and Director of the State of Texas DNA Identity Laboratory, testified for the defense. He is an active collaborative consultant with both the FBI’s DNA laboratory and the equivalent Royal Canadian Mounted Police laboratory in Canada. He opined that Dr. Pflug’s PCR Amp-FLP DNA test results from the ax and rental car samples did not provide any scientifically reliable information. He stated that guidelines had not yet been developed for Amp-FLP testing, and that while Amp-FLP technology will eventually be used by the FBI for forensic purposes, it had not yet reached that stage.
Dr. Eisenberg testified that the Royal Canadian Mounted Police and the FBI both decided not to use the Apo-B region as part of their Amp-FLP identification systems because “they found it to be an extremely difficult system to interpret and to work with and allow the reliable exchange of scientific data....” Dr. Eisenberg stated that Dr. Pflug’s testing process creates artifacts which should not be present, e.g. contaminants, and asserted that the amplification process does not always work properly. He noted several weaknesses with Dr. Pflug’s PCR Amp-FLP testing in the Apo-B region, including the lack of a human control, which he considered essential. Dr. Eisenberg criticized Dr. Pflug’s methodology for lack of positive controls in the gels used, lack of reference standards, lack of computer confirmation, and various other shortcomings. He discounted Dr. Pflug’s conclusions since they were essentially based on visual approximation.
Dr. Eisenberg also testified that he consulted many of the world’s leading authorities on use of Amp-FLP technology. They unanimously agreed that without running samples on the same gel immediately next to reference standards, which was not done by Dr. Pflug in his PCR testing, accurate conclusions could not be reliably reached. Dr. Eisenberg stated, however, that PCR was possibly the most widely recognized technique currently used in research science.
A government expert, Dr. Mitchell Holland, the head of the Armed Forces Institute of Pathology DNA Identification Laboratory, also testified that he would have reported Dr. Pflug’s PCR, Amp-FLP, Apo-B results regarding the ax and rental car, as inconclusive under his laboratory’s standards. Both he and Dr. Eisenberg are members of the FBI’s Technical Working Group in DNA Analysis that is establishing guidelines and standards for reliable (for court systems) DNA testing. He believes that the FBI will eventually start using Amp-FLPs. Dr. Holland stated that without a positive control on a gel, the results are inconclusive, regardless of whether there is a match or not. He also stated that you cannot declare a match across gels as was done by Dr. Pflug, e.g., if there is a sample in gel 1 and another sample in gel 2, even if there is a visual match, it would still be inconclusive under the criteria used in his laboratory. Dr. Holland stated, however, that the conclusions of a European laboratory were not necessarily incorrect merely because they did not apply American standards.

Case Law

The standard of review of a military judge’s admission of expert testimony is whether he abused his discretion. United States v. Houser, 36 M.J. 392 (C.M.A) cert. denied, — U.S. -, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). The trial judge must determine that an expert’s testimony rests on a reliable foundation and is relevant. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,-, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). The standard of evidentiary reliability (admissibility) is whether the evidence or expert’s testimony *631 pertains to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. It must be helpful and there must be a valid scientific connection to the pertinent inquiry as a precondition to admissibility. Daubert, 509 U.S. at-- -, 113 S.Ct. at 2795-96.
When expert scientific testimony is offered, the trial judge must determine at the outset whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. To do so he must first assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. Daubert, 509 U.S. at-, 113 S.Ct. at 2796. Many considerations will bear on the inquiry, among them: whether the theory or technique in question can be and has been tested; whether it has been subjected to peer review and publication; its known or potential error rate and the existence and maintenance of standards controlling its operation; and whether it has attracted widespread acceptance within a relevant scientific community. The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate. Daubert, 509 U.S. at---, 113 S.Ct. at 2796-97. The fact that the protocol for a scientific test is not perfect or that it could be done differently or better is not a basis to exclude the result of a test conducted pursuant to that protocol. Exclusion of the evidence under an uncompromising “general acceptance” standard is not the appropriate means of attacking shaky but admissible evidence. The traditional and appropriate way to attack such evidence is through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. Daubert, 509 U.S. at-, 113 S.Ct. at 2798.
In a court-martial, admissibility of scientific evidence is governed by the Military Rules of Evidence and requires the proponent to establish: “(A) the qualifications of the expert, Mil.R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, United States v. Gipson, 24 M.J. 246 (C.M.A.1987) and Mil.R.Evid. 401; and (F) whether the probative value of the testimony outweighs other considerations, Mil.R.Evid. 403.” United States v. Johnston, 41 M.J. 13, 16 (C.M.A. 1994) (quoting United States v. Combs, 39 M.J. 288, 290 n. 1 (C.M.A.1994)).

Military Judge’s Findings

The military judge found that: the underlying scientific principle in DNA analysis is reliable and accepted; the techniques used in this case were scientifically valid; the RFLP technique yielded valid conclusions in this case; the PCR test “yielded results which may or may not be accepted, but on the facts of this case in an emerging area not yet validated in the United States and where protocols may be in dispute among experts in the field, it is for the fact finders to determine”; with proper guidance the determination of this issue would not overwhelm or confuse the court members; judicial economy considerations were outweighed by the interests of justice; and the probative value of the PCR test outweighed any unfair prejudice. Accordingly, he denied the motion to suppress.

Decision

The military judge did not abuse his discretion by admitting the results of the PCR Amp-FLP test in the Apo-B region. Dr. Pflug is the head of a credible German state laboratory whose PCR process is qualitatively examined twice a year. Dr. Pflug was offered and accepted as an expert in molecular biology, particularly DNA analysis, without objection. He had extensive experience with DNA testing, and had conducted Amp-FLP analysis for over three and one half years. He had worked in the Apo-B region for over two years. Dr. Pflug had analyzed approximately 4,000 samples using this protocol. The subject matter of his testimony assisted the trier of fact to understand the evidence and facts in issue. Dr. Pflug’s testimony and opinions were based on scientific tests conducted in his own laborato *632 ry under his supervision, and his testimony was certainly relevant.
The basic scientific methodology upon which PCR is based is widely accepted in the medical and scientific community, and its efficacy has been recognized by other courts. State v. Lyons, 124 Or.App. 598, 863 P.2d 1303 (1993); Spencer v. Commonwealth, 240 Va. 78, 393 S.E.2d 609 (Va.), cert, denied, 498 U.S. 908, 111 S.Ct. 281, 112 L.Ed.2d 235 (1990). Amp-FLP has been tested across the scientific spectrum. The theory of Amp-FLP, including analysis of the Apo-B region, has been published and subjected to peer review. Dr. Holland testified that, between 1985 and 1990, PCR analysis was the subject of approximately 1400 papers published in the scientific community. Of these articles, at least 50 specifically dealt with the Amp-FLP procedure. Additionally, four scientific papers on PCR analysis that focused on the Apo-B region of DNA were offered at trial. The Apo-B methodology employed by Dr. Pflug is also used by an American, private, for profit laboratory in paternity testing.
Dr. Pflug used an established protocol. He performed PCR testing instead of RFLP, not because he did not recognize the advantages of RFLP, but because there was insufficient DNA available. His PCR results paralleled those done using RFLP where there was sufficient DNA sample (identification of the victim). His opinions, and the underlying scientific principles upon which they were based, were reliable. As stated by Dr. Holland, failure to follow American standards or procedures does not invalidate results. That Dr. Pflug’s protocol was not perfect, or that it could have been done differently, or that its conclusions cannot be ascertained to a scientific certainty, are not bases to exclude the results of his tests. Dr. Pflug’s testing provided legitimate scientifically-based results. There was a dispute as to the validity of these results. The military judge allowed the members to hear this dispute. There was vigorous cross-examination of Dr. Pflug. Dr. Eisenberg, testifying for the appellant, provided an effective critique of Dr. Pflug’s testing process, procedures, techniques, and results. This is what is envisioned by Daubert. Any shortcomings in Dr. Pflug’s testing technique were matters that went to the weight the members could accord the evidence, not its admissibility. I reject this assignment of error.
III. ADMISSIBILITY OF COMBINED POPULATION STUDY STATISTICS
Appellant argues it was plain error to permit the introduction of statistics from a combined population study consisting of 77.5% Germans and only 32.5% Filipinos because those figures inflated the likelihood that the victim was the source of the questioned samples by nearly ten times. The general population statistics presented by Dr. Prenger were derived from the PCR Amp-FLP analysis of a combination of 344 German Caucasians and 100 Filipinos which is not representative of the population of Germany. Appellant asserts that combining the Caucasian German database with the Filipino data base inflated the exclusion statistic because the sample did not include Germany’s many ethnic groups. Appellant also asserts that these population statistics were derived from the same unreliable PCR Amp-FLP technique used to test the alleged samples from the rental car and the ax. The Filipino data base that Dr. Prenger used was collected by Dr. Pflug, so the statistical conclusions she reached are based on the accuracy and reliability of Dr. Pflug’s testing and his conclusions.
Dr. Valerie Prenger, Assistant Professor and Director of the Genetic Epidemiology Section at the University of Maryland at the Baltimore School of Medicine, was qualified as an expert in the field of human population genetics, without objection. She testified that frequency of the genotypes in a population are determined by obtaining DNA samples at random in the population. The samples are then typed for genotype. The Hardy-Weinger Law is the traditional mathematical model used to predict how frequent or rare a particular gene or genotype would be in a population. It has been found to be accurate regardless of in or out migration or mutation rates. Dr. Prenger conducted a statistical analysis of the Amp-FLP analysis conducted by Dr. Pflug, using a database of *633 just Filipinos and a database made up of a combined population of Germans and Filipinos. Her population study did meet the Hardy-Weinger model in this case. She testified, without objection from trial defense counsel, that, conservatively, it was 76.5 times more likely that the samples from the ax and the rented car came from the victim than someone else in the Filipino population. Applying a conservative confidence level, it was 842.3 times more likely that the samples tested came from the victim than anyone else in combined population data base of Germans and Filipinos.

Case Law

Failure to object to testimony constitutes waiver in the absence of plain error. Mil.R.Evid. 103(a)(1)(d); United States v. Dudding, 37 M.J. 429, 430 (C.M.A.1993). To be plain error, “the error must not only be both obvious and substantial, it must also have ‘had an unfair prejudicial impact on the jury’s deliberations.’ ” United States v. Fisher, 21 M.J. 327, 328 (C.M.A.1986); United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). The doctrine should be invoked “sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” Fisher at 328-329.

Decision

Dr. Prenger’s qualifications and the methodology she used to reach her conclusions were unchallenged at trial. She used the acceptable mathematical model to establish her conservative probabilities. There was no evidence presented that rebutted her testimony. Her testimony was admissible under Daubert. There was no plain error.
IV. APPELLANT’S FAILURE TO DENY GUILT
Appellant argues that he was denied his constitutional rights of due process and to remain silent when the government presented evidence that he did not deny the allegations upon being questioned by investigators, and when trial counsel argued that his silence constituted consciousness of guilt.
German police officer Thomas Beckert testified that on 22 and 24 September 1991, he interviewed appellant while appellant was in custody. When he conducted the interviews, the investigation was being conducted by German authorities and no agent of the United States Air Force was involved or present. Appellant was advised of rights which parallel Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Officer Beckert advised appellant that Ms. Pengson was last seen going to visit him, and appellant admitted that he met Ms. Pengson on Saturday, September 7. Beckert stated that appellant cried and stated that when he thought about this crime, “his head was empty and he only looks black.”
Two days later Officer Beckert again spoke with appellant in the United States military prison in Mannheim. Appellant admitted that he had sexual intercourse with Ms. Pengson in his home and in her home. He told Officer Beckert that he rented a vehicle because his automobile was running poorly, and he needed transportation to drive to work. The appellant told Officer Beckert that he could get the death penalty in an American court. Beckert told him that if his case was decided by a German judge, there was no death penalty, but that he would possibly get life imprisonment. Appellant replied it would be “better to be condemned by a German judge.” Appellant also asked Officer Beckert what German prisoners do while in prison. Officer Beckert testified that the appellant never denied any connection or involvement with Ms. Pengson’s murder.
Trial counsel argued as follows during findings:
He starts asking about what his risks are in the various jurisdictions that might try him. “What do German inmates do? Does Germany have the death penalty? What does life in prison really mean in Germany?” “About fifteen years.” He thinks it would be better if he were tried in a German court. Members of the court, this is a man, sitting in a U.S. confinement facility, speaking with a German police detective, accused of the murder of a woman who was last seen in route to his house; in *634 route to meet him. And what is he talking about, the relative risks of which jurisdiction he’s going to be tried in. Remember what Officer Beckert said in the last question that I asked him? “Did, at any time, in either of these interviews the accused ever tell you he’s not involved in Miss Pengson’s death?” “No, he’s talked about everything but that.”
The military judge later instructed the court members concerning consciousness of guilt. Trial defense counsel did not object to the instruction.

Case Law

It is improper to bring to the attention of the court members evidence that the accused exercised his pretrial rights to remain silent or to request a lawyer. Wainwright v. Greenfield, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986); United States v. Garrett, 24 M.J. 413 (C.M.A.1987); United States v. Earnesty, 34 M.J. 1179 (A.F.C.M.R. 1992). Failure to object to the testimony of a witness or argument of counsel constitutes waiver in the absence of plain error. Mil.R.Evid. 103(a)(1), (d); United States v. Dudding.

Decision

Officer Beckert’s interviews of appellant were foreign interrogations in which military authorities did not participate. Consequently, the statements made during these interviews were admissible unless they were obtained through the use of coercion, unlawful influence or unlawful inducement. Mil.R.Evid. 305(h)(2). See also United States v. French, 38 M.J. 420 (C.M.A.1993), cert, denied; — U.S. -, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994). There is no evidence that the statements were involuntary. Appellant was not silent when questioned. He attempted to explain his behavior and asked about what the police knew and which criminal jurisdiction would be most advantageous. He asked what German prisoners did. Appellant did not request that the interviews be terminated or decline to answer questions concerning Ms. Pengson’s death. Neither trial counsel’s questions to Officer Beckert nor his subsequent argument highlighted appellant’s silence when questioned or appellant’s failure to testify at trial. They were a fair comment on what appellant voluntarily said when questioned about Ms. Pengson’s murder. Appellant did not object at trial to either trial counsel’s questions of Officer Beckert or his argument concerning them. There was no plain error, and appellant’s argument is rejected.
V. SPEEDY TRIAL
Appellant asserts that his rights to a speedy trial under R.C.M. 707, Article 10, UCMJ, 10 U.S.C. § 810, and the Sixth Amendment were violated because he was confined for 250 days before charges were preferred. Appellant argues that the speedy trial clock began to run when he was first confined by military authorities at German request, because the Status of Forces Agreement (SOFA) requires the Air Force to assert jurisdiction upon being made aware of charges against a member of the forces.

Background

Appellant was arrested by German police pursuant to an arrest warrant issued by a German judge on 21 September 1991. A confinement hearing was conducted that same day by a German magistrate who determined that confinement was appropriate. Mr. Emst-Juergen Zschiesche, the German legal advisor at the Rhein-Main base legal office, and the base Staff Judge Advocate attended appellant’s pretrial confinement hearing in Bruchsal. They advised the magistrate and German prosecutor that, under the SOFA, they had authority to request that the accused be placed in a United States military confinement facility. The Germans stated that they wanted their police officers to have access to the accused, his mail checked, and then agreed to let the United States confine the appellant. On 22 September 1991, appellant was placed in pretrial confinement at the American military confinement facility on Coleman Barracks, Mannheim, Federal Republic of Germany. A pretrial confinement hearing was held on 25 September 1991. The military magistrate determined that pretrial confinement was appropriate to insure appellant’s presence for *635 trial in German court and because German authority would accept no lesser form of restraint. The Air Force therefore continued the appellant in pre-trial confinement for German authorities.
The commander of the Rhein-Main AB, Air Force Office of Special Investigations (AFOSI) detachment met with German prosecutors on 4 October 1991. The Germans advised him that they would head the investigation and prosecute the case. On 14 November 1991, the Germans advised Mr. Zschiesche that they were awaiting laboratory test results, including DNA results, and that their evaluation of the case depended on these test results. The Germans also stated they wanted the accused continued in pretrial confinement. On 25 November 1991, the German prosecutor advised Mr. Zschiesche that he was still awaiting the results of DNA and other tests which he said were needed to determine jurisdictional facts, such as the SOFA status of the victim (or lack thereof). On three separate occasions, the Germans advised American military authorities that lesser forms of pretrial confinement were not acceptable to them, and they insisted that the U.S. continue pretrial confinement. At a meeting in January 1992, German prosecutors expressed that they thought they had jurisdiction.
The German investigation continued into 1992, and as evidence was seized, it was forensically tested. On 10 March 1992, the AFOSI at Rhein-Main concluded that the victim was not a member of or accompanying U.S. forces. On 28 April 1992, military authorities received a translated copy of the DNA test results, and on 12 May 1992, they notified the German prosecutor, by letter, that the U.S. intended to prosecute appellant. On 29 May 1992, the German prosecutor notified Air Force authorities that the German government would not recall jurisdiction of appellant’s case. Charges were preferred against appellant that same day, and appellant was ordered into military pretrial confinement for the first time pending court-martial. Another pretrial confinement hearing was conducted on 1 June 1992, by a military judge who found that continued confinement was appropriate. Charges were referred against appellant on 15 October 1992, and he was arraigned on 10 December 1992.

Applicable Law

R.C.M. 707(a) requires that an accused be brought to trial within 120 days of preferral of charges or imposition of restraint, whichever is earlier. The government becomes accountable under R.C.M. 707 for the time an accused is in pretrial confinement when he or she is no longer being held for or at the request of foreign authorities pursuant to a treaty obligation. United States v. Murphy, 18 M.J. 220, 234 n. 17 (C.M.A.1984); see United States v. Youngberg, 38 M.J. 635, 639 (A.C.M.R.1993).
To decide if a violation of the Sixth Amendment, Speedy Trial Clause has occurred, we will apply and balance four factors: the length of pretrial delay, the reasons for the pretrial delay, whether the accused has demanded speedy trial, and prejudice suffered by the accused because of the delay. Barker v. Wingo, 407 U.S. 514, 531-32, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101 (1972). Of these factor, we will give especially strong weight to whether an accused has demanded speedy trial. Id
For an accused in pretrial confinement, Article 10, UCMJ, 10 U.S.C. § 810, requires immediate steps to try him or to dismiss the charges and release him. The government satisfies Article 10 when it exercises “reasonable diligence.” United States v. Kossman, 38 M.J. 258, 262 (C.M.A.1993)
When there is a claim that an accused’s right to a speedy trial has been violated, we will grant relief only if the military judge abused his discretion. United States v. Edmond 41 M.J. 419, 422 (1995). We will defer to his findings of fact unless they are unsupported by the evidence of record or clearly erroneous. United States v. Burris, 21 M.J. 140, 144 (C.M.A.1985).
The pertinent provisions of the SOFA (Articles VII and XIX) provide that the U.S. will have primary jurisdiction over crimes committed by a servicemember when the crime involves the property of the U.S., the person or property of another service member or civilian component of the U.S., or a depen *636 dent of a U.S. service member or civilian component. It is incumbent upon the nation having primary jurisdiction to notify the other State of a decision not to exercise its authority. German authorities agreed to waive their right to exercise jurisdiction in offenses over which the U.S. and Germany exercise concurrent jurisdiction with the proviso that the U.S. notify German authorities of its intent to exercise jurisdiction. In cases that involve major interests of German administration of justice, making the exercise of German jurisdiction imperative, German authorities may recall the waiver that is otherwise granted.

Decision

At trial, the military judge found that the confinement from 22 September 1991 until 29 May 1992 was imposed pursuant to treaty obligation and not for purposes of military prosecution. He also found that the Germans would have retained jurisdiction if they felt imposition of the death penalty was a possibility. Furthermore, the military judge concluded that had the U.S. government notified the German government that it intended to proceed to trial based upon the general waiver of jurisdiction prior to completion of the complex forensic investigation, there would likely have been a German recall of jurisdiction. We agree. Because the death penalty was possible under American military law, but not under German law, this was not the typical case where, by common practice, the German authorities released jurisdiction. At no time prior to May 1992 did the German authorities indicate they intended to relinquish jurisdiction or that they would agree to a lesser form of restraint than pretrial confinement of appellant. In fact, it was made clear that the Germans would retain jurisdiction if they felt imposition of the death penalty was a possibility.
Under the SOFA the United States was obligated to notify German authorities of its intent to exercise jurisdiction over appellant, in order to provide the opportunity to recall the waiver. There is nothing in any of the SOFA provisions, however, that mandates when the U.S. must assert jurisdiction. Furthermore, the identity and status of the victim may have been determinative of which sovereign had jurisdiction, i.e., if the victim was a member of the U.S. armed forces, a member of the civilian component or a dependent, the U.S. had exclusive jurisdiction over appellant. Furthermore, the German authorities needed to conduct a complete investigation to determine whether “major interests of German administration of justice” required they exercise jurisdiction in a case involving homicide. Appellant was not available for trial by Air Force authorities until the German government relinquished jurisdiction. Once German authorities waived jurisdiction, appellant was charged and brought to trial within 195 days. Of that time, 140 days were the direct result of approved defense requested delays. These delays are excluded from government accountability. R.C.M. 707(c). The remaining 45 days is well within the 120-day standard. R.C.M. 707(a).
The government exercised reasonable diligence in getting the appellant to trial. United States v. Kossman, 38 M.J. 258 (C.M.A 1993). Therefore, appellant’s Article 10, UCMJ, speedy trial right was not violated. Appellant did not demand a speedy trial, and appellant was not prejudiced by the delay. Moreover, the delay was based on legitimate reasons and was not excessive. Accordingly, we find there was no Sixth Amendment violation. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Appellant’s assertion of error is rejected.
VI. DEFENSE REQUESTED REASONABLE DOUBT INSTRUCTION
The defense requested the military judge give a reasonable doubt instruction which modified the standard reasonable doubt instruction taken from the Army’s MILITARY JUDGE’S BENCHBOOK, Army Pamphlet 27-9, paragraph 2-29.1. The defense requested instruction stated that proof beyond a reasonable doubt means “proof to an evidentiary certainty.” It also instructed that proof beyond a reasonable doubt was “more than mere suspicion or conjecture,” “greater than a preponderance of the evidence,” “a level of proof greater than more likely than *637 not. It is not even sufficient that the evidence be merely ‘clear and convincing.’” The military judge refused to give the tendered instruction, and instead gave one which, in relevant part, stated,
A reasonable doubt is a conscientious doubt, based upon reason and common sense, and arising from the state of the evidence. It is rarely possible to prove anything to absolute certainty • • • What is required is not a mathematical certainty, but a moral certainty. An accused is not to be convicted on suspicion or conjecture, and the accused has the right to rely upon the failure of the prosecution’s proof.

Applicable Law

The military judge has substantial discretion in deciding which instructions to give. We review the military judge’s refusal to give a defense-requested instruction for an abuse of discretion. United States v. Damatta-Olivera, 37 M.J. 474, 478 (C.M.A. 1993), cert, denied, — U.S.-, 114 S.Ct. 2760, 129 L.Ed.2d 875 (1994).

Decision

Appellant’s argument is without merit. The military judge’s instruction to the court members was accurate, and taken together with the instructions on the presumption of innocence, precluded any reasonable likelihood that the court members would apply the instruction improperly or in a manner that violated due process. United States v. Robinson, 38 M.J. 30 (C.M.A.1993). The military judge stated that the court members must rely on “proof’ to base a finding of guilt. There was no abuse of discretion.
VII. CONCLUSION
Consistent with the foregoing, the findings and the sentence are correct in law and fact, the sentence is not inappropriate, and no error prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and the sentence are
AFFIRMED.