UNITED STATES, Appellee,

v.

Michael A. PARTYKA, Staff Sergeant,
U.S. Air Force, Appellant.

No. 63,028.
ACM 27390.

U.S. Court of Military Appeals.

July 5, 1990.

For Appellant: *Major Lynne H. Wetzell* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain James C. Sinwell* (argued); *Colonel Robert E. Giovagnoni* and *Major Paul H. Blackwell, Jr.* (on brief); *Major Terry M. Petrie.*

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial with officer members [1] tried appellant on charges that he had carnal knowledge of Christina M. Smith in July, September, November, and December 1986, and February 1987; that he had committed sodomy with her in December 1986; and that he had solicited her to distribute marijuana in December 1986. Partyka pleaded not guilty to all charges

---

**1.** The decision below erroneously reflects that this case was tried by judge alone.

but was convicted of sodomy and three offenses of carnal knowledge. These offenses were violations of Articles 120 and 125, Uniform Code of Military Justice, 10 USC §§ 920 and 925, respectively. The sentence adjudged—a bad-conduct discharge, 5 years' confinement, and reduction to airman basic—was approved by the convening authority; and the Court of Military Review affirmed the approved findings and sentence. A petition for review having been submitted, we granted review of an issue concerning reception of certain rebuttal testimony during the sentencing proceedings.[2]

## I

Prior to findings, Christina Smith was the only government witness; and her testimony resembled the script of a soap opera. Although she was now 17 years old, she had only been 15 when the alleged offenses occurred. At that time Christina, her mother, and her stepfather, David Smith, had been living in base housing at Langley Air Force Base, Virginia, where Partyka, his wife, Debbie, and their four children were their neighbors.

According to Christina, her stepfather had begun sexually molesting her when she was 12 and had continued to do so for 4 years. In July 1986—during the period when she was being sexually abused by her stepfather—Christina had been asked by the Partykas to babysit one evening for their children. Appellant had left her a six-pack of beer; and when the Partykas returned, Christina was intoxicated. Subsequently, Mrs. Partyka passed out on the floor; and thereafter appellant provided Christina with Tequila Sunrises and made some "advances." Then she "blacked out"; and when she awoke the next morning, there were some indications that she and appellant had engaged in sexual intercourse.[3]

In September 1986, the Partykas again requested that she babysit; and the events that night paralleled those in July.[4] In November, Christina was babysitting once more at the Partykas' house; and she had sexual intercourse with appellant after he had told her "that he would tell my mom" that Mrs. Partyka and Christina's stepfather "were having an affair." When asked by trial counsel why she had sexual relations with appellant on this occasion, her reply was that it was "[b]ecause he threatened me." Christina was scared because appellant was "a rather big man" and she had seen "some of the fights he and [Mrs. Partyka] got into and he got very violent."

During her Christmas vacation in 1986, Partyka had tried on one occasion "to persuade" Christina "to have sex with him"; and, to this end, he had told her "that if I didn't have sex with him, that he would not only tell my mom that" his wife and Christina's stepfather "were having an affair, but that he would also tell my mom that I was on drugs." Christina was "using drugs" at the time because of "the stress that I was being put through from my stepfather." On this occasion, Christina engaged in oral sodomy with appellant before they had intercourse.[5]

In January or February 1987, Mrs. Partyka "got pregnant with" the child of Christina's stepfather; also, "during this time-frame," her stepfather was "still having sex with" Christina. According to Christina, Partyka had "called me and asked me if I would come over and talk to him. He needed someone to talk to. He was upset about Debbie being pregnant,

---

**2.** WHETHER THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF APPELLANT, BY ALLOWING DR. WALKER'S TESTIMONY IN REBUTTAL.

**3.** The court members acquitted Partyka of carnal knowledge with Christina on this occasion.

**4.** Just as for the incident in July, the court-martial acquitted appellant of having carnal knowl-

edge of Christina in September after she had "blacked out."

**5.** Also, during December 1986, appellant had given Christina some money and asked her to buy him a marijuana cigarette. This incident led to the charge of soliciting to distribute marijuana—a charge of which appellant was acquitted.

and Debbie had told" Partyka "she loved Dave and not him and he was upset about it." When she arrived, he told her "he loved" her, and they had sexual intercourse. During this same encounter, Christina had told Partyka about being molested by her stepfather; and appellant had told Christina that he already knew about it because "his wife had told him in October or November" after Christina "had told her" about it. At the time of trial, Christina had been in therapy for about 3 months; and she felt that Partyka "has kind of messed up my life."

On cross-examination, Christina admitted that on one occasion in early 1986, she had falsely "accused a young man of raping" her, when there had not "even been any sexual intercourse." Moreover, the drugs she was taking "for stress" were marijuana, "speed," and cocaine; and Christina had used drugs "long before" ever knowing Partyka.

During the sentencing proceedings, appellant presented the testimony of a supervisor and of his mother; and then he made an unsworn statement in question-and-answer form. In response to a question from his counsel, "Did you ever threaten her to do anything?" he answered, "No sir. As a matter of fact she said that she would tell, you know, say that I raped her if I didn't on a couple of occasions."

Partyka also stated that he was not "blaming Christina for what happened"; and that the responsibility for his offenses lay "[w]ith me." In response to a question as to how he felt "about the fact that those offenses occurred," appellant answered:

I feel pretty bad about it. But one thing I can feel good about is that I know Tina is finally getting some help in all this, the hell that she was going through with her stepfather and what-not is over with. I wish I could have done more or known about what was going on sooner. I really didn't do a whole lot by the time I found out. I was confused and scared and didn't know what to do.

When asked, "Do you understand that what you've done with Christina might have affected her also?", his answer was:

Yes, sir. And I just hope that—I feel really sorry and I hope that, you know, that she can overcome it and, you know, it's not going to be a problem for her. I never abused her or, you know, coerced her into doing anything. I was always just trying to help her with the problems that she had that she would come to us, me and my wife, that she had. I don't know—I just don't want anything bad to happen to her.

After the unsworn statement had been made and defense exhibits had been received, the defense rested, whereupon an Article 39(a), UCMJ, 10 USC § 839(a), session took place. In the course thereof, the defense asked about the intended testimony of Dr. Marilyn J. Walker, whom trial counsel had proposed to call as a rebuttal witness. According to the prosecutor,

[h]er testimony is going to be that the accused in his unsworn statement placed most of the blame and trauma of Tina Smith on [her stepfather]. In fact she will say that the accused is equally or perhaps greater than equally responsible for the trauma. She will also explain what that trauma is. She will also explain, based upon her treatment of Tina Smith, the very small tiny likelihood she would ever threaten the accused with rape in order to have sexual intercourse with her at all because it is not consistent at all with her treatment and her personality based upon her treatment.

Defense counsel then objected that this would not be "proper rebuttal" evidence; and the military judge also expressed his concern whether Dr. Walker could properly give "her personal opinion as to whether or not Christina is being truthful when she says that the accused forced her as opposed to what the accused says, which was that Tina was at least in part responsible for making advances towards the accused."

Trial counsel responded that the military judge had misconceived the purpose of the testimony. The witness would not be

saying that the accused did or did not make threats to have sex. But what she is saying is that the socio dynamic she was involved in and because of her personality at the time, based on her treatment, she would not have made threats. She was not likely to have made threats to turn the accused in for rape. It's not a lie detector on what she says at all, but it's based upon her treatment of this girl and based upon what this girl was going through at the time—the likelihood of the threats that the accused said were made by Tina Smith was very very small. The main thing is that it goes against his testimony, not against hers. There are two separate threats. He says she made a threat to turn him in and she says he made a threat. The doctor is talking about his threats, not about Tina's threats.

After the defense had questioned Dr. Walker's "expertise ... to comment on whether Christina made these threats in the first place," trial counsel emphasized that the psychologist would not become "a lie detector for Tina. It's the accused's credibility I'm talking about, not Tina's."

Ultimately, Dr. Walker, who had been practicing psychology since 1968, was allowed to testify. She was asked, "[I]n his unsworn statement, Michael Partyka seemed to indicate that most of the problems that Tina has is the result of David Smith. Do you have an opinion upon where the blame should be allocated for Tina's problems?" Over defense objection, she responded:

A. I would say that David did certainly program this child to participate in his sexual activities, and his sexual activities extended beyond herself and his family. It was a part of the trap that she was in. In cases where a child is raped or molested by more than one person, the trauma is compounded. So that the second individual, particularly if it is a person known to the child—

Q. Like a neighbor?

A. Yes. A relative or a neighbor. It seems to compound the trauma, in that

that person who may be in a position to intervene on behalf of that child to report a molester to the authorities—instead of doing such a thing, himself participates in the molestation of the child, compounds the trauma of the child.

A later colloquy between the prosecutor and the witness was to this effect:

Q. Ma'am, in his unsworn statement, the accused said Tina threatened him. Basically the threats were that if he didn't have sex with her, that she would report him for rape. Now based upon your knowledge of the family backdrop and your counselings with Tina, is it likely or unlikely that Tina would make such a threat as charged by the accused?

A. Okay, this is not something that has been reported to me. It isn't consistent with what she would have done, although—

Q. Why not?

A. Although—

MJ: Let her finish her answer.

WIT: She was a frightened child. Children often will appear to be cooperative and she had been programmed very carefully by her stepfather to lie, to protect him, under a very serious threat that she would be sent away from home, that she couldn't live with her mother, that her mother wouldn't love her anymore, and she was a terrified child. And children that are placed in this situation often will try their best to cooperate with the adults who are requiring it of them.

On cross-examination, Dr. Walker conceded that her evaluation of the psychological trauma to Christina from appellant's crimes was based on the premise that Partyka had known she was being sexually abused by her stepfather and that this premise—like "[a]ll of the information that I have"—was "based on what Christina told me." She thought that the possibility Partyka had not known of the sexual abuse was "about five percent." Dr. Walker denied that she was biased in any way, al-

though she had declined to talk with defense counsel. She also admitted that in her written report, she had stated that defense counsel's interview of Christina "was in essence another rape of an emotional nature"—which resulted in "emotional scars."[6]

On cross-examination, Dr. Walker also explained, "I assume that when a patient comes to me, that they are telling the truth, and I assume that unless I have some reason to believe otherwise. I have had no reason to believe otherwise." Therefore, she assumed what Christina had told her was "essentially true." When asked on recross-examination about the possibility that Christina might have "behaved inappropriately" with Partyka "as a result of her abuse by her stepfather," Dr. Walker responded

> that there is possibly a twenty percent chance that she might have behaved in that way, but it is not consistent with the fear and trauma she was going through, however. I would doubt it. But to grant a possibility if we were going to guess, I would say it would be possible.

After the closing arguments on sentence, the military judge advised the members extensively as to sentence. One of his instructions was: "You should consider in aggravation the testimony by Doctor Walker concerning the effect on the victim in the case."

## II

RCM 1001(c)(2)(A), Manual for Courts–Martial, United States, 1984, provides that, during sentencing proceedings, "[t]he accused may testify, *make an unsworn statement*, or both in extenuation, in mitigation, or to rebut matters presented by the prosecution, or for all three purposes whether or not the accused testified prior to findings." (Emphasis added.) The Manual also states that "[t]he accused may make an unsworn statement and may not be cross-examined by the trial counsel upon it or examined upon it by the court-martial. *The prosecution may, however, rebut any statements of facts therein.* The unsworn statement may be oral, written, or both, and may be made by the accused, by counsel, or both." RCM 1001(c)(2)(C) (Change 2) (emphasis added).

The right to make an unsworn statement after findings of guilty has been recognized by the Manual for Courts–Martial since the adoption of the Uniform Code of Military Justice. *See, e.g.*, para. 75c (2)(c) and 53h, Manual for Courts–Martial United States, 1969 (Revised edition); para. 75c (2), Manual for Courts–Martial, United States, 1951. Also, unsworn statements were permitted prior to adoption of the Uniform Code—even with respect to guilt or innocence. *See* para. 76, Manual for Courts–Martial, U.S. Air Forces, 1949; §§ 359, 419, and 614, Naval Courts and Boards, 1937.

We shall not speculate as to why for decades military law has granted accused servicemembers the right to make an unsworn statement. However, so long as this valuable right is granted by the Manual for Courts–Martial, we shall not allow it to be undercut or eroded.

■ If the Government may rebut an unsworn statement under circumstances not permitted by RCM 1001(c)(2)(C), the right to make an unsworn statement becomes a trap for the accused and counsel. In due course, defense counsel will discourage their clients from making such statements because of the possibility that the Government will be free in the guise of rebuttal to introduce evidence that other-

---

6. According to the same report, defense counsel's

> apparent excitation at such times that Tina was reduced to tears of frustration and shame from his incessant accusations was fearful for Tina. Whether his excitation was the result of his hoping to "win" points, or a case for his client, or whether he is indeed sexually aroused by the discomfiture of a young girl,

> would be difficult even for a psychologist or psychiatrist to assess.

Defense counsel was justifiably incensed by the ridiculous suggestion that he might have been "sexually aroused" by his interrogation of Christina. Indeed, during cross-examination, the witness admitted that she did not "actually believe that the defense had some sexual motive for its examination."

wise would be inadmissible for sentencing purposes.

In *United States v. Cleveland,* 29 MJ 361 (CMA 1990), the military judge had allowed the Government to "rebut" the accused's unsworn statement with evidence which did not contradict or explain any factual assertion contained in the statement. Recognizing that to condone such prosecutorial tactics would have a "chilling effect" on use of unsworn statements, we held that the military judge had violated RCM 1001(c)(2)(C) and that the accused had been prejudiced thereby.

█ Here, trial counsel adopted the same tactics used by the prosecutor in *Cleveland.* Instead of offering Dr. Walter's testimony as evidence in aggravation under RCM 1001(b)(4), the prosecutor was seeking to bring this evidence in through the back door as rebuttal.[7] However, as we read it, the unsworn statement does not support trial counsel's comment that it "placed most of the blame and trauma of Tina Smith on David Smith." Even if it did so, this would not be a "statement of fact" within the contemplation of RCM 1001(c)(2)(C).

We agree with the military judge's view that the prosecution was entitled to rebut Partyka's claim in his unsworn statement that "on a couple of occasions" Christina had told him that she would "say that I raped her if" he did not engage in sexual acts with her. However, the proper means of rebuttal would have been testimony from Christina that she had never threatened appellant in this manner. Instead of proceeding so forthrightly, trial counsel attempted to show that Partyka's unsworn statement was untrue because it was very doubtful that someone like Christina, who had ungone the trauma of sexual abuse by her stepfather, would make such threats.

█ Trial counsel maintained that Dr. Walker had not become a human "lie detector"—as prohibited by *United States v.*

*Petersen,* 24 MJ 283 (CMA 1987); *United States v. Cameron,* 21 MJ 59 (CMA 1985) —because she was not corroborating any testimony given by Christina. However, we consider it equally objectionable for her to opine that appellant's unsworn statement must have been untrue. In our view, Dr. Walker's opinion was not admissible under Mil.R.Evid. 702, 1984 Manual, *supra,* because it would not "assist the trier of fact to understand the evidence" sought "to determine a fact in issue." Instead, it would lead the factfinder to speculate. Furthermore, whatever probative value the testimony possessed was substantially outweighed by the danger of unfair prejudice and of misleading the court-martial members. Mil.R.Evid. 403.

We note also that, in some respects, Dr. Walker's opinion was founded on assumptions inconsistent with the evidence received at trial. For example, as the defense brought out in cross-examination, the expert apparently assumed that Christina suffered additional trauma because she had believed that Partyka knew that her stepfather was sexually abusing her but had not sought to rescue or assist her. However, Christina's own testimony was that not until February 1987 did she inform appellant of her mistreatment by her stepfather; and presumably until then she had assumed that appellant had no knowledge of that abuse.

█ Our reading of the record indicates that the defense objections were adequate to avoid waiver. *See* Mil.R.Evid. 103. However, even if the defense did not object in sufficient detail, admission of Dr. Walker's expert testimony must be characterized as plain error. *See* Mil.R.Evid. 103(d). Moreover, the harm arising from reception of the "rebuttal" evidence was enhanced by the military judge's instruction that Dr. Walker's testimony could be considered for purposes of aggravation. We conclude, therefore, that—just as in *Cleveland*—the

---

7. Apparently the Government had planned to offer Dr. Walker's testimony as a matter in aggravation; but she had not been present, and "it was the Government's decision to go on with-

out her." The prosecutor was seeking to cure this omission by offering the expert as a rebuttal witness.

sentence should be reassessed or there should be a rehearing as to sentence, as the court below in its discretion deems appropriate.

### III

The decision of the United States Air Force Court of Military Review as to sentence is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for a determination of the appropriate remedy for the error.

Judge COX concurs.

SULLIVAN, Judge (concurring in part and dissenting in part):

As pointed out in the majority opinion, appellant has an important right to make an unsworn statement for purposes of sentencing. This right, however, is not absolute in the sense that his comments may not be rebutted by the Government. *See* RCM 1001(c)(2)(C), Manual for Courts-Martial, United States, 1984. Doctor Walker's testimony on the compounding effect of appellant's conduct on this previously-abused victim was proper rebuttal in my view. *See United States v. Collier*, 29 MJ 365, 368–69 (CMA 1990) (Sullivan, J., dissenting); *United States v. Cleveland*, 29 MJ 361, 364 (CMA 1990) (Sullivan, J., dissenting). To this extent, I dissent. However, I agree that other parts of her testimony should not have been admitted and that prejudicial error may have resulted from admission of that testimony.