UNITED STATES, Appellee,

v.

James A. THOMAS, Technical Sergeant,
U.S. Air Force, Appellant.

No. 96–0160.
Crim.App. No. 30797.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 18, 1997.

Decided Sept. 29, 1998.

For Appellant: *Captain Harold M. Vaught* (argued); *Robert E. Watson* (on brief); *Colonel Jay L. Cohen, Colonel Douglas H. Kohrt,* and *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Lieutenant Colonel Michael J. Breslin* (argued); *Colonel Jeffery T. Infel-*

ise, *Colonel Theodore J. Fink*, and *Colonel Brenda J. Hollis* (on brief).

## Opinion of the Court

CRAWFORD, Judge:

Contrary to his pleas, appellant was convicted by an officer panel of premeditated murder and desecration of a corpse, in violation of Articles 118 and 134, Uniform Code of Military Justice, 10 USC §§ 918 and 934, respectively. The convening authority approved the sentence of a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 43 MJ 626 (1995). We granted review of the following issues:

I

WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED WHEN, DESPITE HOLDING THAT THE MILITARY JUDGE COMMITTED ERROR BY ADMITTING DNA [DEOXYRIBONUCLEIC ACID] EVIDENCE CONCERNING PCR [POLYMERASE CHAIN REACTION] AMP–FLP [AMPLIFIED FRAGMENT LENGTH POLYMORPHISM] ANALYSIS IN THE APO–B [APO–LIPO PROTEIN, B–GENE] REGION, IT NONETHELESS AFFIRMED APPELLANT'S CONVICTION.

II

WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS MISAPPLIED INTERNATIONAL AGREEMENTS BETWEEN THE UNITED STATES AND THE FEDERAL REPUBLIC OF GERMANY WHEN IT HELD THAT THERE WAS NO VIOLATION OF APPELLANT'S RIGHT TO A SPEEDY TRIAL NOTWITHSTANDING THE FACT THAT HE WAS CONFINED FOR 250 DAYS BEFORE CHARGES WERE PREFERRED.

We also specified the following issues for review: [1]

I

WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED WHEN IT HELD THAT THE JUDGE ERRED IN ADMITTING DNA EVIDENCE CONCERNING PCR AMP–FLP ANALYSIS IN THE APO–B REGION. IF SO, WAS THE ERROR HARMLESS?

II

BASED UPON THE NARROW SCOPE OF THE ISSUE PRESENTED IN APPELLANT'S SUPPLEMENT TO HIS PETITION FOR GRANT OF REVIEW AND THE FACT THAT THE GOVERNMENT HAS NOT CERTIFIED ANY QUESTION PERTAINING TO THE AIR FORCE COURT OF CRIMINAL APPEALS' DECISION, DOES THE RULING OF THAT COURT—THAT THERE WAS ERROR IN ADMITTING EVIDENCE CONCERNING PCR AMP–FLP ANALYSIS IN THE APO–B REGION—CONSTITUTE THE LAW OF THE CASE?

III

DOES THE LAW OF THE CASE DOCTRINE, OR OTHER APPLICABLE LAW, PRECLUDE THIS COURT FROM DETERMINING WHETHER THE RULING OF THE TRIAL COURT WAS CORRECT AS A MATTER OF LAW AND, IF CORRECT, AFFIRMING THE DECISION BELOW ON THE BASIS OF SUCH DETERMINATION?

For the reasons stated below, we affirm the Court of Criminal Appeals.

### FACTS—DNA Evidence—Issue I

Appellant was charged with the premeditated murder and dismembering of his girlfriend, Yolanda Pengson. Investigators located blood both in the trunk of a car rented

---

1. Resolution of the granted issues makes it unnecessary to decide Specified Issues I, II, and III.

by appellant and on an ax accessible to appellant. Controversial DNA testing using PCR Amp–FLP analysis in the Apo–B region indicated that this blood was Miss Pengson's. 43 MJ at 630. The results of the DNA tests were admitted, over objection, against appellant at trial.

■ This Court reviews a judge's evidentiary rulings for abuse of discretion. *United States v. Youngberg,* 43 MJ 379, 381 (1995) ("judge did not abuse his discretion" in admitting DNA evidence using the RFLP analysis). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), writing for the majority, Justice Blackmun pointed out that the overall concern with evidentiary rulings is relevance and reliability. *Id.* at 589, 113 S.Ct. 2786. For determining reliability of expert scientific testimony, he listed various factors including the following:

(1) "empirical" testing;

(2) "peer review and publication";

(3) a technique's known error rate;

(4) "the existence and maintenance of standards"; and

(5) "general acceptance" in the field.

*Id.* at 593–94, 113 S.Ct. 2786.

In reviewing a trial judge's decision to admit or exclude evidence, the Supreme Court in *General Electric Company v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997), citing *Spring Co. v. Edgar,* 99 U.S. 645, 658, 25 L.Ed. 487 (1878), emphasized that, whether admitting or excluding evidence, the standard is whether there is an abuse of discretion such that "the ruling is manifestly erroneous."

This case was tried prior to *Daubert.* In admitting the evidence, the judge relied upon Mil.R.Evid. 702, Manual for Courts–Martial, United States (1994 ed.), and *United States v. Gipson,* 24 MJ 246 (CMA 1987). "*Gipson* generally foreshadowed *Daubert* and is substantially consistent with that Supreme Court decision, [thus] we will entertain appellant's arguments against admissibility of government evidence based on the ... foundational considerations delineated in *Daubert.*" *Youngberg,* 43 MJ at 385.

The crux of appellant's claim is aimed at three points:

(1) "PCR AMP–FLP testing is not scientifically reliable under *Daubert.*" Final Brief at 62;

(2) "Amp–FLP testing in the APO–B region [of the DNA molecule] is not scientifically reliable." *Id.* at 66; and

(3) "The methodology employed by ·Dr. Pflug is scientifically unreliable." *Id.* at 68.

Appellant concedes that the "general theory" of PCR analysis of DNA is scientifically valid. *Id.* at 62. However, he contends that the Amp–FLP form of PCR analysis is unreliable. More specifically, he claims that the Amp–FLP analysis of the Apo–B region of the DNA is not scientifically reliable.

Several experts [2] testified about this form of DNA testing at appellant's trial. Dr. Holland testified that various "validation studies" on Amp–FLP testing have been conducted in the United States. Only one laboratory in the United States or Canada has "attempted to use" the Apo–B region in their forensic testimony. German laboratories determine reliability based on their own validation studies and the quality control measures used. Dr. Eisenberg testified that neither PCR nor Amp–FLP technology has been "validated" in the "forensic setting" in the United States. However, he admitted that Dr. Holland had "vast experience" in the "sequencing of the PCR."

In addition, Dr. Pflug testified that his laboratory had conducted research on Apo–B for 2 years. The defense expert, Dr. Eisenberg, never claimed that any testing had been conducted which showed the Amp–FLP

---

2. For the prosecution: Dr. Mitchell M. Holland, DNA Identification Laboratory, Armed Forces Institute of Pathology; Valerie L. Prenger, Assistant Professor and Director of the Genetic Epidemiology Section at the University of Maryland School of Medicine; Dr. Werner Pflug, a Micro-

biologist with the State Criminal Laboratory, Stuttgart, Germany.

For the defense: Dr. Arthur J. Eisenberg, Associate Professor, Department of Pathology, Texas College of Osteopathic Medicine and Director of the Texas DNA Identity Laboratory.

analysis of the Apo–B region was unreliable. However, the FBI has not used such testing because it wants to standardize techniques and it has a·preference for other systems.

After listening to Dr. Pflug's testimony as to the ax and material obtained from the trunk of the car, Dr. Eisenberg stated that this testimony was "uninterpretable, inconclusive, and no criteria either match or non-match can be applied to that analysis." However, he did agree with Dr. Pflug that there was a "match" in identifying the torso with the samples from appellant's girlfriend. But Dr. Eisenberg had "not analyzed the Apo–B region" or done PCR testing. Because of the "great deal of variability" in the Apo–B region, it is less likely to be used in forensic analysis. He agreed with Dr. Holland that there were variable lengths and not a repeat of a fixed size in comparing the known and the unknown. At the present time, there is not "a gel system that is capable of resolving" this ambiguity. In examining prosecution exhibit 30, he noted the difference between the known sample and the ax from Building 243. He thought it would be better if the bands were placed next to each other for comparison. Dr. Eisenberg testified he "wouldn't discount what Dr. Pflug had said, but there are certainly other explanations which could account for additional bands" in prosecution exhibit 30. Dr. Eisenberg testified his non-use is not based on unreliability. The Government contends that, "[i]f samples are tested using a DNA analysis procedure that is accepted in courts as a matter of judicial notice, and the conclusions reached are the same as those reached as a result of Amp–FLP analysis," this would verify the theory of the Amp–FLP analysis. Answer to Final Brief at 58 (citation omitted). Dr. Pflug testified that he conducts the Amp–FLP analysis the same as the RFLP testing.

## DISCUSSION

The judge made the following findings:

First, the underlying scientific principle in DNA analysis is reliable and accepted. Second, the techniques used in this case are scientifically valid. Third, with respect to the RFLP test, the application of that technique yielded valid conclusions in this case. With respect to the PCR test, the application of that test yielded results which may or may not be accepted, but on the facts of this case in an emerging area not yet validated in the United States and where protocols may be in dispute among experts in the field, it is for the fact finders to determine. Fourth, with proper guidance the determination of this issue will not overwhelm or confuse the court members. Fifth, the concern of judicial economy is legitimate in view of the time taken and likely to be spent on this matter, but in view of the seriousness of the allegation of premeditated murder the court will expend whatever time is required to resolve this case in the interests of justice. Sixth, considering the probative value of the PCR test, the court finds that it is not outweighed by any consideration of unfair prejudice to the accused.

After trial, the judge made the following supplemental essential findings:

The Polymerase Chain Reaction (PCR) method of DNA analysis is widely accepted in the medical and scientific community. R. 112. The Amplified Fragment Length Polymorphism (Amp–FLP) application of that method is a newer technique, which has been in use in research for 5 or 6 years, but has not been used forensically in the United States. R. 139. Dr. Werner Pflug, is a microbiologist at the crime laboratory of the German State of Baden–Wurttemberg, who has been working on forensic applications of DNA analysis since 1987. R. 189. More pertinently, he has developed and applied standards within his laboratory for forensic application of Amp–FLP technology to a particular gene, the Apo–Lipo protein, B gene (Apo–B), R. 115, which is highly polymorphic, meaning there are many variations from individual to individual, making measurement and population studies of variations more informative in the attempt to identify the likely source of evidentiary genetic material. R. 123. In PCR analysis, a reference ladder is used to size the fragments found on ·a gel. R. 114. This ladder, as used in Dr.

Pflug's laboratory, consists of actual human fragments taken from Dr. Pflug's own population studies, and thus serves as an adequate control in identifying other fragments found on a gel. R. 211–212; 274–275. (See also, R. 937–938; 951–952; 956). The defense consultant, Dr. Arthur Eisenberg, has not personally analyzed the Apo–B region by PCR or RFLP. R. 244, 262. He agrees that it is highly polymorphic, but points out .that its use as a forensic standard was rejected by the FBI. R. 246. Although Dr. Eisenberg did not view the PCR results as being in any [sic] corroborated by the RFLP testing in this case R. 268, the court found there was such corroboration, R. 303, even if not to forensic standards, and that such corroboration was proper for the court members to evaluate in determining the weight, if any, they would accord the PCR analysis.

\* \* \*

Evaluating the available evidence in this case by the standards for relevance, admissibility, and potential to assist the factfinder, the court was impressed with the credentials, credibility, and presentation of Dr. Pflug as a field scientist, and concluded that Dr. Pflug's procedure, developed and applied uniformly within his laboratory, coupled with the fact that the reference ladders used were developed in the very same laboratory, using the same procedures, provided adequate assurance of consistency, reliability and accuracy in testing and interpretation of results. Accordingly, under appropriate instruction (R. 354–355; 1249–1250) the court members were permitted to evaluate the population studies in conjunction with the DNA analysis of the Apo–B genetic material by the PCR Amp–FLP method.

App. Ex. LIV.

■ Although the military judge had the benefit of *Gipson*, 24 MJ 246, he did not have the benefit of the Supreme Court's detailed guidance in *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786, regarding his "gatekeeping" function. However, we need not decide whether the military judge properly performed his gatekeeping function, because any error in admitting this evidence was harmless in light of the overwhelming evidence against appellant. Art. 59(a), UCMJ, 10 USC § 859(a).

Appellant was stationed in Germany at the time of the offenses. On a Thursday, four days before Miss Pengson's body was discovered, appellant called Hertz Auto Rental to obtain a car for the next day, Friday. He told his supervisor that his car "was running poorly" and that he wanted to drive to Hannover with a friend. 43 MJ at 628. In reality, appellant loaned his car to another friend for the weekend. A round-trip to Hannover would have been approximately 700 kilometers. *Id.* at 629. On Friday at about 1600 hours, appellant, "accompanied by a woman named Yolanda," with "the same physical characteristics ... as the victim," got the rental car, a maroon Ford Sierra. *Id.* at 628.

On Saturday evening, Yolanda attended a dinner party with a friend. During the party, she called appellant and asked him to pick her up at the main train station. Yolanda's friend walked her to the streetcar station. This was the last time Yolanda was seen alive.

Meanwhile, in his off-duty time, appellant worked as a mechanic at the auto shop on base. That Saturday evening at approximately 2200 to 2230 hours, "a female with 'an oriental voice'" called the auto shop "and asked to speak to the appellant." Appellant was not there at the time, but when he returned, a friend told him about the call. Appellant left 5 minutes later. *Id.* at 629.

Either late Saturday night or early Sunday morning, appellant called his supervisor at the auto craft shop and told him he had to come in late to work (he arrived about 1030 hours) on Sunday. On Sunday evening, he called his duty supervisor between 2300 and 2400 hours "and asked to be excused from work on Monday."

At approximately 0300–0400 hours on Monday, appellant was seen entering the military compound with his rental car. He drove to the garage in Building 242, where his duty station was. He stayed there approximately 45 minutes. *Id.* at 629. A later

search of that building's women's restroom washbasin drain revealed hair which matched the victim's hair. Additionally, an ax, the only unwrapped and dustless ax in the area, was seized from a shelf in Building 243. The ax had blood on it. *Id.* at 630.

On Monday morning at about 0710 hours, an individual was riding a bike in a forest about 100 kilometers from Frankfurt. The person noticed a car fitting the description of appellant's rental car "coming from the forest traveling at a high rate of speed." The individual noticed what appeared to be a light shining back where the vehicle came from. About one hour later, a forester came upon Yolanda's burning body in that area.

Shortly after 0950 hours on Monday, appellant returned the rental car and told the agent that the car had "leaves and dirt in the back floorboard and trunk when he rented the vehicle." The agent noticed that there was "a large stain in the trunk." *Id.* at 629. The vehicle had only been driven 554 kilometers, less than the roundtrip distance to Hannover. *Id.* at 629. The vehicle was cleaned the next day, but when it was seized by the German police approximately 2 weeks later, fibers were seized from the car. When these were examined, they were believed to have traces of blood on them. *Id.* at 630.

Appellant was questioned by Thomas Beckert, a German police officer. *Id.* at 635. After a rights' advisement paralleling *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), appellant admitted he had seen the victim on Saturday. Two days later, appellant was again questioned and admitted having "sexual intercourse with" the victim in his house and in her house. Appellant "told Officer Beckert that he rented a vehicle" on the weekend in question "because his automobile was running poorly, and he needed transportation to . . . work." Appellant "told Officer Beckert that he could get the death penalty in an American court." Officer Beckert told him that "there was no death penalty" in Germany, but he could get life in prison. "Appellant replied it would be 'better to be condemned by a German judge.'" Appellant "never denied" or admitted "any connection or involvement with" the murder. 43 MJ at 635. Thus, if the judge erred in admitting the DNA evidence, the error was harmless because of this overwhelming evidence.

FACTS—Speedy Trial—Issue II

This issue centers on whether the United States is responsible for the approximately 234 days appellant spent in pretrial confinement from September 21, 1991, until May 12, 1992. On October 4, 1991, Germany informed the United States that it intended to prosecute appellant. On May 12, 1992, the United States notified the German Government of its intent to assert jurisdiction, but Germany did not relinquish jurisdiction until May 29, 1992. 43 MJ at 637.

"Appellant was arrested by German police pursuant to an arrest warrant issued by a German judge on 21 September 1991. A confinement hearing was conducted" by a German judge.

The Staff Judge Advocate for Rhein–Main Air Base and a German legal advisor were present at the hearing. They requested that appellant be released to United States military authorities and held in a military facility on behalf of Germany, in accordance with applicable international agreements. Germany granted this request under specified conditions. *Id.* at 636.

The military judge found that, but for this request, appellant would have been placed in German pretrial confinement. *Id.* at 638. A military hearing was conducted to determine whether pretrial confinement was appropriate for the purposes of assuring appellant's "presence" for prosecution by Germany and because the German courts would not accept a "lesser form of restraint." *Id.* at 636–37.

DISCUSSION

■ The North Atlantic Treaty regarding the Status of Forces (NATO SOFA) states that there are two types of jurisdiction: exclusive and concurrent. 4 UST 1792, June 19, 1951, TIAS No. 2846, 199 UNTS 67 (effective generally Aug. 23, 1953); (effective in the Federal Republic of Germany, July 1, 1963), *reprinted in* Air Force Pamphlet (AFP) 110–20 at 2–2 (27 July 1981). Exclu-

sive jurisdiction exists when the laws of only one country are violated. Art. VII, ¶ 2, NATO SOFA. In this case there was concurrent jurisdiction, because both countries had jurisdiction to try appellant for the murder of Yolanda Pengson.

Article VII, ¶ 3, NATO SOFA, provides, in pertinent part, that in such a case:

(a) The military authorities of the sending State shall have the primary right to exercise jurisdiction over a member of a force ... in relation to

(i) offences solely against the property or security of that State, or offences solely against the person or property of another member of the force or civilian component of that State or of a dependent;

(ii) offences arising out of any act or omission done in the performance of official duty.

(b) In the case of any other offence the authorities of the receiving State shall have the primary right to exercise jurisdiction.

(c) If the State having the primary right decides not to exercise jurisdiction, it shall notify the authorities of the other State as soon as practicable. The authorities of the State having the primary right shall give sympathetic consideration to a request from the authorities of the other State for a waiver of its right in cases where that other State considers such waiver to be of particular importance.

* * *

6. (a) The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offence. The handing over of such objects may, however, be made subject to their return within the time specified by the authority delivering them.

Under these provisions, the United States has the primary right to exercise jurisdiction over a servicemember who commits an offense against the United States, another servicemember, or a dependent, or for offenses arising out of official duty. Art. VII, ¶ 3(a). In all other cases, the receiving state, Germany in this case, retains the primary right to try an individual. Art. VII, ¶ 3(b).

The NATO SOFA has been modified further by the "Agreement to Supplement the Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany" (Supplementary Agreement). 14 UST 531, 536–37, 3 Aug. 1959, TIAS No. 5351, 481 UNTS 262, *reprinted in* AFP 110–20 at 2–17 (Ch. 2, Apr. 29, 1982).

Article 19 of the Supplementary Agreement provides:

1. At the request of a sending State, the Federal Republic shall, within the framework of sub-paragraph (c) of paragraph 3 of Article VII of the NATO Status of Forces Agreement, waive in favour of that State the primary right granted to the German authorities under sub-paragraph (b) of paragraph 3 of that Article in cases of concurrent jurisdiction, in accordance with paragraphs 2, 3, 4 and 7 of this Article.

2. Subject to any particular arrangements which may be made under paragraph 7 of this Article, the military authorities of the sending State shall notify the competent German authorities of individual cases falling under the waiver provided in paragraph 1.

3. Where the competent German authorities hold the view that, by reason of special circumstances in a specific case, major interests of German administration of justice make imperative the exercise of German jurisdiction, they may recall the waiver granted under paragraph 1 of this Article by a statement to the competent military authorities within a period of twenty-one days after receipt of the notification envisaged in paragraph 2 or any shorter period which may be provided in arrangements

made under paragraph 7. The German authorities may also submit the statement prior to receipt of such notification.

4. If, pursuant to paragraph 3 of this Article, the competent German authorities have recalled the waiver in a specific case and in such case an understanding cannot be reached in discussions between the authorities concerned, the diplomatic mission in the Federal Republic of the sending State concerned may make representations to the Federal Government. The Federal Government, giving due consideration to the interests of German administration of justice and to the interests of the sending State, shall resolve the disagreement in the exercise of its authority in the field of foreign affairs.

* * *

7. In the implementation of the provisions of this Article and to facilitate the expeditious disposal of offences of minor importance, arrangements may be made between the military authorities of a sending State or States and the competent German authorities. These arrangements may also extend to dispensing with notification and to the period of time referred to in paragraph 3 of this Article within which the waiver may be recalled.

The United States and Germany have agreed that Germany will waive its right to primary jurisdiction when the United States makes a request that it do so. Art. 19, ¶ 1. This request then gives the United States primary jurisdiction unless "competent German authorities hold the view that, by reason of special circumstances in a specific case, major interests of German administration of justice make imperative the exercise of German jurisdiction." In such case, "they may recall the waiver" within 21 days after receipt of the request. Art. 19, ¶ 3.

The defense argues that the United States eventually requested that Germany waive its right to primary jurisdiction and that it could have done so earlier. Therefore, it contends that the United States had primary jurisdiction and should be held accountable for approximately 234 days (cf. 49 MJ at 205) dur-

ing which appellant was confined by the United States on behalf of Germany. Final Brief at 53–58.

The Protocol of Germany to the Supplementary Agreement (Protocol) provides further guidance on Germany's major interests. 14 UST 631, Aug. 3, 1959, TIAS No. 5351. The Protocol to Article 19 provides:

2. (a) Subject to a careful examination of each specific case and to the results of such examination, major interests of German administration of justice within the meaning of paragraph 3 of Article 19 may make imperative the exercise of German jurisdiction, in particular in the following cases:

(i) offences within the competence of the Federal High Court of Justice (Bundesgerichtshof) in first and last instance or offences which may be prosecuted by the Chief Federal Prosecutor (Generalbundesanwalt) at the Federal High Court of Justice;

(ii) *offences causing the death of a human being,* robbery, rape, except where these offences are directed against a member of a force or of a civilian component or a dependent;

(iii) attempt to commit such offences or participation therein.

(b) In respect of the offences referred to in sub-paragraph (a) of this paragraph the authorities concerned shall proceed in particularly close cooperation from the beginning of the preliminary investigation in order to provide the mutual assistance envisaged in paragraph 6 of Article VII of the NATO Status of Forces Agreement.

Because we hold that the judge's findings are not clearly erroneous, we agree with the court below, 43 MJ at 637, and hold that the Government was not accountable for the time, for speedy trial purposes, during which appellant was in pretrial restraint prior to the United States' request for jurisdiction from Germany, *id.* at 638.

208

However, whether appellant's Fifth Amendment due process rights were violated will be tested under *United States v. Reed,* 41 MJ 449, 451–53 (1995); *see also United States v. Mulderig,* 120 F.3d 534, 540 (5th Cir.1997). To succeed on his theory, appellant has the burden of showing "an egregious or intentional tactical delay and actual prejudice." *Reed,* 41 MJ at 452. Placing the burden on appellant to show the reasons for delaying the request for primary jurisdiction is not a burdensome task. The parties who are responsible for notifying the Germans are well known, as are the German authorities. Also, appellant has not shown how he was prejudiced by the delay.

We hold that there was no violation of appellant's due process rights or his right to a speedy trial. We remind appellant that it is "[f]ar better ... for an American accused to be tried by American court-martial, where he is entitled to representation, liberal rules of evidence, a presumption of innocence, and thorough review, than to be brought before a" foreign court. *United States v. Burney,* 6 USCMA 776, 802, 21 CMR 98, 124 (1956); *see also United States v. Jensen,* 25 MJ 284, 288 (CMA 1987) (it is "American national policy ... that ... our military personnel should be tried by courts-martial rather than by courts of a host country").

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, GIERKE, and EFFRON concur.